

FILED

√ 6

APR 1 4 2010

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

**POSTED ON WEBSITE**

**AMENDED MEMORANDUM**

**N O T  F O R   P U B L I C A T I O N**

**(ORIGINAL MEMORANDUM ALREADY PUBLISHED)**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | | |
|---|---|---|
| In re | ) | Case No. 09-14453-B-13 |
| | ) | |
| Robert Lynn Scholz and | ) | DC No. MHM-1 |
| Carolyn Gail Scholz, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

**AMENDED MEMORANDUM DECISION REGARDING TRUSTEE'S
OBJECTION TO CONFIRMATION OF CHAPTER 13 PLAN
(AMENDED TO ADD NEW FOOTNOTE NO. 4)**

Michael H. Meyer, Esq., appeared in his capacity as the chapter 13 trustee.

Gary Huss, Esq., appeared on behalf of the debtors, Robert Lynn Scholz and Carolyn Gail Scholz.

Before the court is an objection by the chapter 13 trustee, Michael H. Meyer, Esq. (the "Trustee") to confirmation of a chapter 13 plan (the "Plan") filed by the Debtors, Robert and Carolyn Scholz (the "Debtors"). The Trustee contends that the Debtors have understated the amount of their monthly income in Part I of Form 22C, the Means Test (the "Objection"). Specifically, the Debtors did not report and include the pension and retirement benefits which Mr. Scholz receives under the Railroad Retirement Act of 1974 (45 U.S.C. § 231 *et seq.*) (the "RRA") in their calculation of income on line 11 of Form

22C. This exclusion causes the Debtors to be "below median income" for purposes of calculating the "applicable commitment period" of their Plan and the amount of "disposable income" which must be paid to unsecured creditors. In this case of first impression, the court must decide whether pension and retirement benefits received under the RRA ("RRA Benefits") are "income" within the meaning of the Bankruptcy Code. Because the RRA includes an antigarnishment/antialienation clause which appears to absolutely protect RRA Benefits from the reach of creditors, the Objection will be overruled.

This memorandum contains findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52. The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 11 U.S.C. § 1325[1] and General Orders 182 and 330 of the U.S. District Court for the Eastern District of California. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(L).

**Background and Findings of Fact.**

The Debtors have filed a petition seeking relief from their creditors and a fresh start under chapter 13. With their petition, they filed the required schedules of assets and liabilities. Those schedules reveal that Mr. Scholz is a retired employee of the Burlington Northern & Santa Fe Railway Corporation ("BNSF"). Mrs. Scholz is employed with a local real estate agency and receives a modest pension from her former employer. On schedule I, the Debtors report an average monthly income in the amount of $6,799.61, which includes Mr. Scholz's pension or retirement income in the amount of $3,824.06. On schedule J, the Debtors report average monthly expenses, including payments for their mortgage and automobiles, in the amount of $6,361.36. This leaves a monthly net income

---

[1]Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036, as enacted and promulgated *after* October 17, 2005, the effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Publ. L. 109-8, Apr. 0, 2005, 119 Stat. 23.

on schedule J, line 16, in the stated amount of $438.25. The Trustee does not object to any of the income or expenses reported on schedules I and J.

The Debtors also filed Official Form 22C entitled "Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income" (the "Means Test").[2] In chapter 13, the Means Test is used to determine, *inter alia*, how many years certain debtors must pay into a chapter 13 plan (the "applicable commitment period"). The Means Test is also used to calculate how much disposable income certain debtors must pay to their unsecured creditors over the term of the plan. In Part I, line 2 of the Means Test, the Debtors report Mrs. Scholz's "Gross wages, salary, tips, bonuses, overtime, commissions" to be $3,436.13. The amount stated for Mr. Scholz is $0. On line 6, under "Pension and retirement income," the amount reported for Mrs. Scholz is $386.85. The amount stated for Mr. Scholz is again $0. On line 9, under "Income from all other sources," the amount reported for both Debtors is $0. Thus, the Debtors' current monthly income ("CMI") is stated on line 11 to be $3,822.98. Their annualized CMI is calculated in Part II, line 15 to be $45,875.76 (12 x $3,822.98). The "Applicable median family income" for a family of two is shown on line 16 to be $65,097. Thus, the Debtors' annualized CMI is stated to be substantially below the applicable median family income. Pursuant to Part III, line 23, the Debtors were therefore not required to complete Parts IV, V or VI of the Means Test for the purpose of calculating their disposable income.

Attached to the Means Test is a statement of "Current Monthly Income Details for the Debtor." That statement lists the monies which both of the Debtors have received each month for the six-month period preceding commencement of the bankruptcy case. Because Mr. Scholz worked for BNSF, his pension and retirement benefits are administered under the RRA by the U.S. Railroad Retirement Board. He does not receive any social security benefits. Under the heading, "Non-CMI-Excluded Other Income," Mr. Scholz reported the receipt of pension and retirement benefits in the average amount

_____

[2]The "Means Test" is frequently referred to as Form 22C or Form B22C.

3

of $3,709.25 per month. These benefits are paid from two sources. The first is listed under the heading "U.S. Treasury–Railroad Retirement" and averages $2,910 per month. The second is listed under the heading "Santa Fe Railroad Retirement" and averages $799 per month.

The Plan provides for monthly payments to the Trustee in the amount of $438 for a "commitment period" of 60 months. The Debtors intend to surrender one automobile. Their mortgage payment and other automobile payment will be paid directly to the creditors outside of the Plan. Unsecured creditors will receive a 7% distribution on claims estimated to total $264,205, a total distribution of approximately $18,494.[3] At the conclusion of the Plan, the Debtors will request a complete discharge of their unsecured debts pursuant to § 1328(a).

**Issue.**

The sole question presented to the court is whether RRA Benefits must be included in the calculation of CMI. There are no disputed issues of fact. The Trustee objects to the Debtors' CMI because it does not include Mr. Scholz's RRA Benefits. If those Benefits are included in the CMI calculation, then the Debtors would be "above median income" for the purpose of determining both the applicable commitment period of the Plan and the disposable income which must be distributed to unsecured creditors. The Debtors' Plan already provides for payment of their monthly "net income" (schedule J, line 16) to fund the Plan, but the Trustee contends that the unsecured creditors are entitled to receive the disposable income that would be calculated in Parts IV, V, and VI of the Means Test.[4]

---

[3]The unsecured nonpriority claims listed on schedule F total $181,231. Based on the discrepancy between the Plan and schedule F, the Trustee objected to confirmation of the Plan contending that unsecured creditors should receive a 12% distribution, not the 7% stated in the Plan. In response, the Debtors have agreed to correct the error in the confirmation order.

[4]In the moving and responding briefs, neither party addressed the existence of 45 U.S.C. § 231m (discussed below) or its application to the issue before the court. On November 30,

1   The Debtors contend that RRA Benefits should be excluded from the calculation

2   of CMI. They offer three arguments. First, the Debtors suggest that the RRA Benefits

3   constitute "benefits received under the Social Security Act" ("SSA Benefits") which are

4   statutorily excluded from CMI. Second, the Debtors argue that the RRA Benefits should

5   be treated the same as SSA Benefits because the railroad retirement system and the social

6   security system serve the same functional purpose and because Mr. Scholz's employment

7   with BNSF made him ineligible for participation in the latter. Third, the Debtors argue

8   that RRA Benefits do not constitute "income" in the first place because they represent

9   money taken from a retirement account.

10  **The Applicable Law.**

11  Bankruptcy Code subsection 1325(b)(1) states in pertinent part that if the chapter

12  13 trustee or an unsecured creditor objects to plan confirmation, then the court may not

13  approve the plan unless, as of the effective date of the plan, unsecured creditors either get

14  paid in full or receive at least the benefit of the debtor's projected disposable income over

15  the applicable commitment period.[5]

16  The term "disposable income" is defined in subsection 1325(b)(2) to mean

17  "current monthly income received by the debtor . . . less amounts reasonably necessary to

18  be expended." The term "current monthly income," or CMI, is defined in subsection

19

20

21  2009, this court issued a request for supplemental briefing regarding the effect of § 231m. The
    Debtors filed a supplemental brief on December 15, 2009. The Trustee did not respond to the

22  court's request.

23  [5]Section 1325(b)(1) states:
    (b)(1) If the trustee or the holder of an allowed unsecured claim objects to the

24  confirmation of the plan, then the court may not approve the plan unless, as of the effective date

25  of the plan–
    (A) the value of the property to be distributed under the plan on account of such

26  claim is not less than the amount of such claim; or
    (B) the plan provides that all of the debtor's *projected disposable income* to be

27  *received in the applicable commitment period* . . . will be applied to make payments to

28  unsecured creditors under the plan. (Emphasis added.)

5

101(10A)(A) to mean the "average monthly income from all sources that the debtor receives . . . without regard to whether such income is taxable income, derived during the [preceding] 6-month period . . . ." The definition of CMI excludes income received from specific sources, including SSA Benefits, payments to victims of war crimes or crimes against humanity, and payments to victims of international terrorism. § 101(10A)(B).

The amount of a debtor's CMI, specifically the debtor's status as being above or below median income, determines the method for calculating the expenses, or the "amounts reasonably necessary to be expended," which can be deducted from CMI to arrive at the bottom line disposable income. For a below-median-income debtor, the deductions are based on a "reasonably necessary" test and the court can generally look to schedules I and J to begin that inquiry. For an above-median-income debtor, subsection 1325(b)(3) provides that the allowable deductions must be determined with reference to subsection 707(b)(2). To fulfill that function, the Debtors would be required to complete the Means Test.

**Analysis.**

**Overview of the Railroad Retirement Act.** The notion of special retirement and disability protection for railroad workers first appeared in federal law as the Railroad Retirement Act of 1934, 48 Stat. 1283 (the "Act"). The Act preceded the Social Security Act of 1935 (the "SSA") by one year. The Act was intended to provide "a system of retirement and disability benefits for persons who pursue careers in the railroad industry." *Hisquierdo v. Hisquierdo*, 439 U.S. 569, 573 (1979). Sponsors of the Act believed that it would encourage older workers to retire by providing them with the "means to enjoy the closing days of their lives with peace of mind and physical comfort and so would 'assure more rapid advancement in the service' and also more jobs for younger workers." *Id.* at 573-74, n.1 (citing H.R. Rep. No. 1711, 74th Cong. 1st Sess., 10, 1935).

The Act was soon ruled unconstitutional by the U.S. Supreme Court on the grounds, *inter alia*, that it took property in violation of the Fifth Amendment and exceeded Congress' authority under the Interstate Commerce Clause. *Id.* at 574, n.3

6

1 (citing *Railroad Retirement Board v. Alton R. Co.*, 295 U.S. 330 (1935)). In response,

2 Congress enacted substantially similar legislature in 1935 based on its constitutional

3 powers to tax, spend and provide for the general welfare. The President worked with

4 Congress to reformulate the Act and it reappeared two years later as the Railroad

5 Retirement Act of 1937, 50 Stat. 307. Thereafter, the Act was amended several times to

6 bring the railroad retirement system into conformity with the social security system.

7 *Hisquierdo*, 439 U.S. at 574 n.3.

8      The railroad retirement system was thoroughly revamped in the Railroad

9 Retirement Act of 1974. In its modern form, the RRA resembles both a private pension

10 program and a social welfare plan. The railroad retirement system is funded through a

11 federal tax imposed on both the railroad companies and the employees. *Id.* at 574 (citing

12 the *Railroad Retirement Tax Act*, 26 U.S.C. § 3201-3233). RRA Benefits are paid from

13 the Railroad Retirement Account, a trust fund. 45 U.S.C. § 231n. RRA Benefits are

14 available in two tiers.[6] The upper tier, tier 1, is tied to the employee's earnings and years

15 in railroad service. Tier 1 is the equivalent of a private pension plan. The lower and

16 larger tier of benefits, tier 2, corresponds to the benefits that a nonrailroad employee

17 would expect to receive for equivalent nonrailroad service under the SSA. *Id.* at 574-75.

18      Railroad employment is specifically excluded from the SSA. 42 U.S.C. 410(a)(9).

19 However, the railroad retirement system is interwoven with the social security system in

20 many respects and they bare a number of similarities. Indeed, the provisions of the RRA

21 are so closely analogous to those of the SSA that the regulations and case law interpreting

22 the SSA can be applied to the RRA. *Elam v. Railroad Retirement Bd.*, 921 F.2d 1210,

23 1213 (11th Cir. 1991) (citation omitted). Unlike private pension plans, RRA Benefits and

24

25

---

26    [6]The RRA established the U.S. Railroad Retirement Board to administer the benefit
programs in addition to other railroad-related benefit issues. (45 U.S.C. § 231(f).) A complete

27 summary of the RRA and its benefit structure is available from the U.S. Railroad Retirement
Board, in a form entitled "Railroad Retirement and Survivor Benefits" (form IB-2 (February

28 2010)) at http://www.rrb.gov/pdf/opa/ib2.pdf.

1    SSA Benefits are not contractual.  At any time, Congress may alter or even eliminate
2    them.  Both systems are funded by a federal tax on the employers and the employees.
3    RRA Benefits and SSA Benefits are also similar in that Congress afforded the recipients
4    of both statutory protection "from creditors, tax gatherers, and all those who would
5    'anticipate' the receipt of benefits."  *Hisquierdo*, 439 U.S. at 575-76.

6        **Application to the Trustee's Objection.**  Based on the similarities between the
7    RRA and SSA, the Debtors contend that RRA Benefits are essentially the same as SSA
8    Benefits, the latter being expressly excluded from the definition of "current monthly
9    income" in subsection 101(10A)(B).  Since retired railroad workers are not eligible to
10   receive SSA Benefits for their years of railroad service, the Debtors argue that RRA
11   Benefits are the "functional equivalent" of SSA Benefits.  Implicit in the Debtors'
12   argument is the contention that Congress erred when it failed to exclude RRA Benefits
13   from the statutory definition of CMI.  The Trustee responds by pointing out that RRA
14   Benefits are not SSA Benefits and that Congress could have excluded RRA Benefits from
15   the definition of CMI if it wanted to, citing *Clark v. Capital Credit & Collection Services,*
16   *Inc.*, 460 F.3d 1162, 1169 (9th Cir. 2006) and the authorities therein for the doctrine of *ex-*
17   *pressio unius est exclusio alterius* (The express enumeration of an exception in a statute
18   indicates that other exceptions should not be implied).

19       The court agrees with the Trustee in one aspect.  First, it is clear that RRA Benefits
20   are not "benefits received under the Social Security Act" and are not therefore expressly
21   excluded from the definition of CMI by operation of the Bankruptcy Code.  The railroad
22   retirement system is administered under a separate statutory framework by a separate
23   administrative agency, and it serves a special purpose, to provide retirement and disability
24   benefits for railroad workers and their families.  The RRA became law at a different time
25   than the SSA and it evolved down a different legislative path.  When Congress
26   established the social security system, it specifically excluded railroad employment from
27   its coverage.  The Trustee is correct in his contention that if Congress wanted to exclude
28   RRA Benefits from the Bankruptcy Code's definition of CMI, it could have done so.

8

1  Congress did not make a mistake and it is not for this court to presume so or try to fix it.
2  It is fundamental that, "[i]f Congress enacted into law something different from what it
3  intended, then it should amend the statute to conform it to its intent. 'It is beyond our
4  province to rescue Congress from its drafting errors, and to provide for what we might
5  think . . . is the preferred result.'" *Lamie v. United States Trustee (In re Lamie)*, 540 U.S.
6  526, 542 (2004) (citing *United States v. Granderson*, 511 U.S. 39, 68 (1994)).

7      That having been said, the omission of RRA Benefits from subsection
8  101(10A)(B) does not automatically lead to the conclusion that RRA Benefits must be
9  included in CMI, nor does the court have to imply Congress' intent by simply reading
10  within the four corners of the Bankruptcy Code. "There is a basic difference between
11  filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively
12  and specifically enacted." *Id.* at 538 (citation omitted).

13      The railroad retirement system, and the treatment of RRA Benefits, is governed by
14  a separate body of federal law, the RRA.  Within that legislation, Congress included an
15  antigarnishment/antialienation provision in 45 U.S.C. § 231m ("§ 231m") which states in
16  pertinent part:

17          (a) Except as provided in subsection (b) of this section and the
            Internal Revenue Service Code of 1986 [26 U.S.C.A. § 1 et seq.],
18          *notwithstanding any other law of the United States*, or of any State,
            territory, or the District of Columbia, *no annuity or supplemental
19          annuity shall be assignable or be subject to any tax or to
            garnishment, attachment, or other legal process under any
20          circumstances whatsoever, nor shall the payment thereof be
            anticipated.* (Emphasis added.)
21

22      Section 231m of the RRA is strikingly similar to the antigarnishment/antialienation
23  clause which Congress included in the SSA at 42 U.S.C. § 407(a):

24          The right of any person to any future payment under this subchapter
            shall not be transferrable or assignable, at law or in equity, *and none
25          of the moneys paid or payable or rights existing under this
            subchapter shall be subject to execution, levy, attachment,
26          garnishment, or other legal process, or to the operation of any
            bankruptcy or insolvency law.* (Emphasis added.)
27

28      42 U.S.C. § 407 imposes a broad bar against the use of any legal process to reach

9

all social security benefits. It is broad enough to include all claimants. *Philpott v. Essex County Welfare Board*, 93 S.Ct. 590, 592 (1973). Subsection 407(a) offers such powerful protection for SSA Benefits, that it operates to exclude SSA Benefits from the bankruptcy estate altogether and makes them free from the operation of any bankruptcy law. *Carpenter v. Ries (In re Ries)*, 408 B.R. 244, 248-49 (8th Cir. BAP 2009). This court cannot find any reason not to give the same effect to § 231m.

When Congress amended the Bankruptcy Code in 2005 to specifically exclude SSA Benefits, it did so to clarify and confirm existing law, not change it. Prior to the enactment of BAPCPA, some bankruptcy courts were including SSA Benefits in the calculation of disposable income, notwithstanding the operation of 42 U.S.C. § 407. *In re Devilliers*, 358 B.R. 849, 866 (Bankr. E.D.La. 2007). "Now under the provisions of BAPCPA, Congress has provided an unambiguous directive that social security benefits are not considered in calculating disposable income and are therefore unavailable to pay claims generally." *Id.* The RRA was enacted long before BAPCPA. There is nothing in BAPCPA to suggest that Congress intended to abolish § 231m of the RRA. Borrowing the Trustee's argument, Congress could have expressly modified or abolished § 231m when it passed BAPCPA if it wanted to. Congress is presumed to know the law and the effect of its legislation. See *Cannon v. University of Chicago*, 441 U.S. 677, 696-703 (1979).

The concept of calculating "projected disposable income" for distribution to unsecured creditors (§ 1325(b)(1)(B)) necessarily requires the court to anticipate what the Debtors' future income will be. However, § 231m expressly prohibits the anticipation of future RRA Benefits. "It is well established that 'when a statute's language is plain, the sole function of the courts–at least where the disposition required by the text is not absurd–is to enforce it according to its terms." *Lamie*, 540 U.S. at 534. The exclusion of RRA Benefits from the operation of the Bankruptcy Code might at first seem to be unfair to creditors, but it does not lead to an absurd result. There is no other way to give any meaning to § 231m which applies "notwithstanding any other law of the United States."

10

1    As one court recently observed with regard to SSA Benefits and the application of 42

2    U.S.C. § 407(a):

3            The exclusion of social security benefits from disposable income
         might appear counter intuitive at first. However, because creditors
4            had no right to seize these benefits pre-petition, their exclusion from
         disposable income post petition is not a drastic change in a creditor's
5            position. Decisions regarding credit advances could not, or perhaps
         should not, have been based on the existence of social security
6            income. As a result, their exclusion leaves creditors in no worse a
         position than existed pre-petition, with two important exceptions.

7

8    *In re Devilliers*, 358 B.R. at 866.

9            Again, this court cannot find any reason why the same analysis should not apply to

10   RRA Benefits.

11   **Conclusion.**

12           Based on the foregoing, the court is persuaded that RRA Benefits are absolutely

13   protected from any adverse action by creditors of the recipient. Indeed, the court

14   interprets 45 U.S.C. § 231m to exclude RRA Benefits from the operation of the

15   Bankruptcy Code altogether. Accordingly, Mr. Scholz's RRA Benefits should not be

16   included in the calculation of CMI within the meaning of § 101(10A). The Trustee's

17   Objection to confirmation will be overruled.

18           Dated: April ___/4___ , 2010

19

20

21   W. Richard Lee
     United States Bankruptcy Judge

22

23

24

25

26

27

28

                                    11